617 So.2d 570 (1993)
J.W. DEVILLE, et al., Plaintiffs-Appellees,
v.
BUDD CONSTRUCTION COMPANY, et al., Defendants-Appellants.
No. 92-221.
Court of Appeal of Louisiana, Third Circuit.
April 7, 1993.
Rehearing Denied May 25, 1993.
*572 Jeffrey Michael Bassett, Patrick Craig Morrow, Sr., James P. Ryan, Opelousas, for plaintiff-appellee J.W. Deville et al.
Francis A. Olivier, III, Sunset, for defendant-appellant State of La.
Terry L. Rowe, Lafayette, for defendant-appellee N.H. Ins. and Ortego, Sr.
A. R. Johnson, IV, Lake Charles, for defendant-appellee La. Farm Bureau Ins.
Thomas Dennis Benoit, Baton Rouge, for intervenor State Employees Grp. Benefit Program.
James Paul Doherty, Jr., Opelousas, for plaintiff-appellee Kevin Wayne Perry.
Before STOKER, THIBODEAUX and SAUNDERS, JJ.
STOKER, Judge.
These consolidated cases arise from a single vehicle accident. Jack Ortego, Jr. accidentally drove his vehicle into a large excavated hole in a section of I-49 which was under repair. Jack Ortego, Jr. was killed and his two guest passengers, Cory Deville and Kevin Wayne Perry, were seriously injured. All three passengers in the vehicle were minors. The parents of the three minors filed these three lawsuits, which were consolidated for trial.[1] Although the judgments are inartfully drawn, the Devilles recovered judgment against the State, DOTD and Jack Ortego, Sr. The Perrys and the Ortegos recovered judgment against the State, DOTD.
The State, Department of Transportation and Development (DOTD) appeals the judgments in all three suits. The Devilles appeal the judgment in their suit. The Ortegos and the Perrys have not appealed.

FACTS
At night, on September 23, 1988, Jack Ortego, Jr. drove his vehicle into an excavated section of I-49 southeast of Alexandria, Louisiana, at the overpass intersection of I-49 and Louisiana Highway 167. The overpass consisted of two bridge type constructions which elevated I-49 over Highway 167. The intersection is sometimes referred to as the Meeker intersection. At the time, I-49 was incomplete northward of the intersection but was open southward to Opelousas and Lafayette. In order to utilize the southward portion of I-49, southbound traffic from Alexandria took U.S. Highway 71 and then switched to Louisiana Highway 167 at Meeker just south of Lecompte. This led to the intersection in question.
I-49 at the intersection is a four lane divided highway separated by a median. Traffic proceeding north made its exit before reaching the double overpasses by turning right on a ground level feed-off lane to connect with Highway 167. Traffic proceeding south (from Meeker) passed under both overpasses, made a right turn on to a curved-cloverleaf access ramp which gradually ascended to the northerly portion of the southbound lanes of I-49, and there merged with southbound traffic just north of the southbound overpass. Because I-49 was not open north of the overpasses, the only traffic using the southbound overpass was that traffic coming from Meeker.
Louisiana Highway 167 leads from Meeker southerly to Turkey Creek and Ville Platte. Traffic coming from Turkey Creek and Ville Platte gains access to I-49 by a ground level access lane which leads from the right of Highway 167 at a point on the Ville Platte side of the overpasses.
At the time of the September 23, 1988 accident, a repair of a section of I-49 had been undertaken just south of the southbound overpass on the descending portion of I-49. Through subcontractors, the State had broken out a section of concrete slab from both southbound lanes of I-49, which left a large excavated hole thirteen inches deep with steel reinforcing rods protruding from concrete in the unaffected portions of the two lanes. This operation required closing the cloverleaf ramp which, when open, permitted access from Highway 167 *573 for traffic coming from Meeker intending to connect with I-49 south. Failure to close the ramp properly is what led to the accident in question in this litigation. The apparent intention of the State and the subcontractors doing the repair work was that traffic coming from Meeker should proceed on beyond the underpasses and use the Turkey Creek and Ville Platte ground level access to I-49 south.
Earlier in the day Jack Ortego, Jr., with his two companions, Cory Deville and Kevin Wayne Perry, traveled I-49 from some miles south of the Meeker intersection for a shopping trip to Alexandria. On this leg of the trip they traveled the northbound lanes of I-49. On their return trip Jack Ortego, Jr. drove his vehicle up the access ramp on to the southbound overpass, and his vehicle went into the excavated hole. The vehicle burst into flames as it struck the concrete and protruding steel reinforcement rods.
Jack Ortego, Jr., sixteen years old, was killed almost instantly. His body was burned beyond recognition. Cory Deville, fifteen years old and the front seat passenger, suffered brain damage and third degree burns. Cory was pulled from the burning car by Leonard Wiggins, a motorist who happened to be passing by on Highway 167. Leonard had to wait for the wind to shift before he could reach Cory. Fifteen year old Kevin Perry, the back seat passenger, was ejected through the windshield. He sustained a gash on his forehead, a gash on his mouth, a nearly severed tongue, a concussion, and he lost three teeth.
These three personal injury, wrongful death and loss of consortium suits were filed by the boys' parents against the State, DOTD, Budd Construction Co., Waste Management of Central Louisiana and various insurance companies. A great number of third party demands, reconventional demands, cross-claims, and interventions were filed. Ultimately, all defendants settled with the plaintiffs prior to trial, except the State, DOTD and Jack Ortego, Sr. The State, DOTD dismissed its third party demands against Budd Construction and Waste Management prior to trial.
A trial on the merits was held to determine the liability of the State, DOTD and the amount of damages to be awarded to each plaintiff.
After a trial on the merits, the trial judge allocated fault for the accident as follows: the State, DOTD80%; Budd Construction Co. (the contractor employed by the State to do the repair work)10%; Waste Management of Central Louisiana (a subcontractor hired by Budd Construction to supply the road signs)5%; Jack Ortego, Jr. 5%. The trial judge awarded damages as follows: Kevin Wayne Perry$113,623.05; Brenda Faye Soileau Perry$1000; Harold Wayne Perry$500; Cory Jude Deville $5,082,998.64; Barbara Soileau Deville $35,000; J.W. Deville$10,000; Jack Ortego, Sr.$162,485.40; Sheral Ortego $150,000.
The State, DOTD appeals the judgment, contending the trial judge erred in holding it 80% at fault for the accident and in awarding excessive general damages to Kevin Perry.
The Devilles also appeal the judgment, alleging the trial judge erred in holding Jack Ortego, Jr. 5% at fault and in awarding inadequate damages. The Devilles also raise the issue of the constitutionality of the statutes limiting the State's liability for general damages and prejudgment interest, LSA-R.S. 13:5106 and 13:5112.
We amend the judgment and affirm as amended.

I.

ISSUES OF FACT
The position of the plaintiffs is that the defendants, the State (DOTD), Budd Construction Co. and Waste Management of Central Louisiana, were at fault and caused the accident through failure to properly sign the intended diversion of traffic and to properly barricade the access ramp. The State contends that Jack Ortego, Jr. and his companions ignored a "Road Closed" sign at the ramp and removed properly *574 posted barricades so as to permit them to proceed up the ramp.
The trial court rejected the State's contentions. In oral reasons for judgment, the trial judge reached the obvious conclusion that the State, DOTD and its subcontractors were aware of the danger and unreasonable risk posed by the excavation. Indeed, the position taken by the State, that proper measures to avoid access to the excavation were taken, is an admission of its knowledge. Therefore, the trial court concluded that LSA-R.S. 9:2800 was satisfied.
Contrary to the State's claim that the sign posted at the entrance of the access ramp read "Road Closed", the trial judge found that a sign on the shoulder portion of the road under the overpass read "Closed to Thru Traffic." Also contrary to the State's claim that the access ramp was completely barricaded, the trial judge found there was only one movable barricade on the access ramp which "did not completely block the shoulder or the main traveled portion of the roadof the cloverleaf." The trial judge concluded that the sign reading "Closed to Thru Traffic" conveyed no clear meaning to Jack Ortego, Jr. and his companions and there was no impediment to driving up the access ramp. Accordingly, the trial judge found the State, DOTD, and its subcontractors, Budd Construction and Waste Management, to be 95% at fault in causing the accident. The trial court assigned 5% of the fault to Jack Ortego, Jr. but did not explain the basis for finding him at fault. However, implicit in the apportionment of 5% fault to Jack is the finding that he did drive around the barricade on the access ramp, to the extent that it partially blocked the road in front of the excavated site, in violation of LSA-R.S. 32:237. Jack's fault was only slight, compared with the misleading "Closed to Thru Traffic" sign at the entrance to the ramp and the fact that the defendants failed in their duty to completely block the road in front of the hole. See LeJeune v. State, Dept. of Hwys., 215 So.2d 150 (La.App. 3d Cir.1968), writ ref'd, 253 La. 321, 217 So.2d 413 (1969); Reeves v. State, Dept. of Hwys., 80 So.2d 206 (La. App.2d Cir.1955), aff'd, 232 La. 116, 94 So.2d 1 (1957); Rosier v. State, 50 So.2d 31 (La.App.2d Cir.1951). Although orally given, the trial court gave well structured reasons for his conclusions regarding the State, Budd and Waste Management. We find no manifest error in the trial judge's findings of fact and no reason to disturb them.

II.

APPORTIONMENT OF FAULT
The State, DOTD contends the trial judge erred in assigning any fault to it since Jack Ortego, Jr. ignored the barricades and warning signs and, thus, was not operating his vehicle in a reasonable and prudent manner. In the alternative, the State, DOTD argues the trial judge erred in assigning 80% fault to it since Jack Ortego, Jr. was substantially at fault and since both Budd Construction Co. and Waste Management were responsible for the signs and for the safety of the construction sites.
Essentially, the State, DOTD argues that it contracted away its responsibility for the road construction and the placement of warning signs to Budd Construction Co. However, the State, DOTD may not contract away its responsibility to the general public to maintain the highways and their shoulders in a reasonably safe condition; this duty is nondelegable. Roberts v. State, through DOTD, 576 So.2d 85 (La.App.2d Cir.), writ denied, 581 So.2d 685 (La.1991), and cases cited therein. Moreover, in the case before us, the State, DOTD contractually retained the right to control the type and placement of the signs and barricades. The State, DOTD thus remains liable to the plaintiffs.
Under the standards of appellate review set forth in Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990), and Rosell v. ESCO, 549 So.2d 840 (La.1989), we hold that the trial judge's findings of fact and apportionment of fault are not manifestly erroneous or clearly wrong. The trial judge gave detailed oral reasons for judgment *575 which are supported by the evidence. His apportionment of fault was accomplished through proper application of the guidelines set forth by the supreme court in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La. 1985). Therefore, the trial judge's apportionment of fault is affirmed.[2] See also, Roberts v. State, through DOTD, supra; LeJeune v. State, Dept. of Hwys., supra; Reeves v. State, Dept. of Hwys., supra; Rosier v. State, supra.

KEVIN PERRY'S GENERAL DAMAGES
Next, the State, DOTD contends that the award of $100,000 to Kevin Perry for general damages is clearly excessive. We disagree.
The trial judge gave excellent oral reasons for judgment, which are set forth below:
"THE COURT: Kevin Perry was a fifteen year old high school junior when this accident occurred on September 23, 1988 and there's no doubt that he suffered both severe physical and psychological damages, as I'll describe later. During the accident, he apparently went through the windshield because after hearing the evidence about the accident, that's the only plausible explanation as to how he exited that car. He momentarily lost consciousness and his next conscious, I thinkawareness is that the automobile he was just riding in is on fire with his two close friends in it. I think this had to be a horrifying experience for a fifteen year old. He attempted to aid his friend who survived this accident but he couldn't because he kept losing consciousness. He was later taken to the hospital where he was treated. There is no doubt in my mind that he suffered some severe physical pain in both his head and his tongue for a period of time after the accident. Now, he had suffered a very severe laceration to his forehead. His mother said she saw the skull when she visited him at the hospital in the emergency room; of course, this was confirmed by the doctor. And in spite of, I guess you can say, reconstructive and cosmetic surgery, there remains a very visible scar that extends from the left side of the right eyebrow and extends diagonally to the left side of the hair line. I'm satisfied that this will be a source of embarrassment to this young man for the remainder of his life. His tongue was almost severed in two. It has healed but there's some residual problems with it. He still has some numbness, and as he described it, there's a canal in it. Apparently that's where the severe cut had taken place. He suffered a cut in the corner of his left eye and a fractured bone on the left eye socket. He suffered a cut on the left side of the nose and a cut on the lip that went through and through the lip, that's the upper lip. And this left a fairly severe scar, which he now cosmetically hides with a mustache. He suffered a post-traumatic cyst on the left side of his face. This was surgically removed and left a scar. It has recurred, and as the doctor says, it will have to be surgically removed again. I'm satisfied that he suffered headaches after this accident, and probably still suffers them today. And these are headaches that he did not experience before the accident. Of course, thanks to his youth, he returned to his regular activities, I think as he stated, in about two months after this accident. I think while his life may now be classified as normal, relatively speaking, he will suffer with the physical and psychological scars that he suffered through this experience for the remainder of his life. In spite of all of his problems, I consider him to be a very lucky young man when you consider the accident and his two friends.
* * * * * *

*576 "With respect to the physical and mental pain and anguish, past and future and any permanent disability, and the scarring, and his loss of teeth, I've done some independent research and I'm satisfied that an award of $100,000.00 will not be out of line in this particular case, and I so award it. And this has to do with the scarring more than anything else. He'll be awarded $11,223.05 in past medical expenses and $2,400.00 in future medical expenses."
The trial judge neglected to mention that Kevin lost three lower front teeth in the accident. A remaining piece of bone had to be surgically removed from Kevin's gums. He has to wear a temporary denture until he is about twenty years old, when he can be fitted with a permanent denture (for which the trial judge awarded $2400 future medical expenses). Kevin testified that the temporary denture sometimes falls out while he is eating, which causes him embarrassment.
The State argues that the general damages award is excessive because the trial judge erroneously included Kevin's mental anguish over seeing his friends in the burning car. The State contends that Kevin is not entitled to compensation for witnessing his friends' death and injuries under LSA-C.C. art. 2315.6.
The State misunderstands LSA-C.C. art. 2315.6. It is intended to compensate the mental anguish of certain classes of bystanders or non-participants in the accident or event which they witnessed. See LeJeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). LSA-C.C. art. 2315.6 is not the basis for the recovery of mental anguish damages by Kevin Perry in this case. Kevin was one of the accident victims. He is entitled to compensation for any mental anguish he felt, as well as pain and suffering, due to being involved in the accident.[3] See Guillory v. Arceneaux, 580 So.2d 990 (La.App. 3d Cir.), writ denied, 587 So.2d 694 (La.1991). Moreover, the trial judge specifically stated that one of the main reasons for the large award of general damages is the permanent and disfiguring facial scars. The loss of three permanent front teeth is also disfiguring.
We do not find a clear abuse of the trial court's much discretion in awarding $100,000 general damages to Kevin Perry. See Wilkinson v. Town of Baker, 506 So.2d 739 (La.App. 1st Cir.1987); Davis v. Southern Farm Bur. Cas. Ins. Co., 406 So.2d 287 (La.App. 3d Cir.1981); Wattigney v. Government Emp. Ins. Co., 407 So.2d 1261 (La.App. 4th Cir.1981), writ denied, 412 So.2d 99 (La.1982). Therefore, we will affirm the general damages award in favor of Kevin Perry against the State, DOTD, in the amount of $80,000 ($100,000 × 80%).

III.
The plaintiffs, J.W. and Barbara Deville and Cory Deville, have also appealed the judgment. They allege as errors the trial judge's assessment of 5% fault to Jack Ortego, inadequate awards of general damages, future medical expenses and care expenses to Cory Deville, and inadequate awards for loss of consortium to J.W. and Barbara Deville. They also raise, for the first time, the issue of the constitutionality of the statutory caps on prejudgment interest and general damage awards against the State.

FAULT OF JACK ORTEGO, JR.
Plaintiffs allege the trial judge clearly erred in finding that Jack Ortego, Jr. was 5% at fault in causing the accident. For the reasons given above in the discussion of the State, DOTD's appeal as to the assessment of fault, we affirm the trial court's apportionment of 5% fault to Jack Ortego, Jr.

CORY DEVILLE'S DAMAGES
The trial judge awarded Cory Deville $350,000 for past and future pain and anguish and $250,000 for loss of enjoyment of life. We find the trial judge clearly *577 abused his discretion and amend the judgment to award $750,000 in general damages to Cory Deville.
According to the evidence adduced at trial, prior to the accident Cory was a normal sixteen year old boy. He made average to better than average grades, was good humored and popular, enjoyed an active social life and was looking forward to a higher education after finishing high school. Three of his four siblings completed college and one completed a vo-tech school program. Cory's IQ was somewhere in the middle average range prior to the accident.
In the accident, Cory suffered a brain stem injury and third degree burns on his right shoulder, neck, right ear, left thigh and knee, and left hand. He was in a coma for several weeks. He was hospitalized for almost six months following the accident. Cory underwent five skin graft surgeries and several more are recommended to restore his right ear and to relieve the contracting of the scar tissue on his neck, which draws his face down and restricts the range of motion of his right arm. Cory's scars are permanent.
Cory's other permanent injuries are memory impairment, speech impairment, visual tracking dysfunction, 10 to 15% anatomical disability in his left hand (the non-dominant hand), 30 to 35% disability in the range of motion in his neck and right arm, 30% anatomical disability to his whole body, and heat and cold intolerance. Also, Cory must wear Jobst garments for the burns for five to six years. The garments cause sweating, itching, and odors. His skin is now easily irritated by clothing and he is at greater risk for skin cancer. Cory suffers hemiplegia, a loss of function in the left side of his body, which causes him to have an impaired walking ability. Cory must use a cane or a walker and falls down often. He also suffers from loss of bladder control.
Emotionally, Cory now suffers from a sense of isolation, depression and frustration. He often curses aloud without realizing it. His overall IQ is now about 80, the very bottom of the low average range. His judgment, reasoning, adaptability and insight are impaired. His ability to learn significant new information is impaired. He was unable to finish high school. It is unlikely that Cory will ever marry and have children.
The trial judge found, and the medical evidence showed, that Cory is in need of long-term placement in a structured, supervised care facility, rather than an in-home care attendant. Cory's mother and father both testified, and the trial judge found, that they were unable to fully care for Cory or to always control him.
In Trahan v. State, through DOTD, 536 So.2d 1269 (La.App. 3d Cir.1988), writ denied, 541 So.2d 854 (La.1989), this court held that $700,000 was the lowest possible general damage award to a twenty-one year old man with a brain injury similar to Cory's, but with no burn injuries. In Hood v. State, through DOTD, 587 So.2d 755 (La.App.2d Cir.), writs denied, 590 So.2d 81, 82 (La.1991), a ten year old boy was awarded $800,000 for a brain injury similar to Cory's plus $100,000 for loss of vision in one eye. In Capone v. King, 467 So.2d 574 (La.App. 5th Cir.), writs denied, 468 So.2d 1203, 1205 (La.1985), the court lowered the general damages award to $700,000 for a brain injury which caused intellectual and emotional deficits but no motor function impairment. See also, the lengthy discussion of older brain injury cases in Capone, supra at 582.
We note that the traumatic brain injury awards in the jurisprudence do not include awards for third degree burns. In Thompson v. PetroUnited Terminals, Inc., 536 So.2d 504 (La.App. 1st Cir.1988), writs denied, 537 So.2d 212, 213 (La.1989), the court held that the lowest reasonable general damages award for burn injuries similar to Cory's was $50,000.
After reviewing the evidence and the prior jurisprudence, we hold that the trial judge did abuse his great discretion in awarding only $600,000 general damages to Cory Deville. The lowest amount which could reasonably be awarded is $750,000. Therefore, the State, DOTD is liable to Cory for $600,000 ($750,000 × 80%) and *578 Jack Ortego, Sr. is liable to Cory for $37,500 ($750,000 × 5%).
We take judicial notice, however, of LSA-R.S. 13:5106, which limits the amount of general damages recoverable from the State to $500,000. Therefore, the amount of general damages for which the State, DOTD is cast in judgment to Cory is reduced from $600,000 to $500,000. See Mitchell v. State, DOTD, 596 So.2d 353 (La.App. 3d Cir.), writ denied, 600 So.2d 680 (La.1992).
Plaintiffs also argue that the trial judge's awards of $3,500,000 for future care expenses (exclusive of future medical expenses) is inadequate. The trial judge acknowledged that Cory requires perpetual supervision and that he will never be self-sufficient. He also found that in-home care for Cory is not realistic and that he still requires more rehabilitation to reach his maximum potential. The trial judge noted that the testimony of both the plaintiffs' and the defendant's economic experts essentially differed only in the percentages used for calculating changes in income and increases in the cost of care. Plaintiff's expert estimated future care expenses of $7,879,152 and defendant's expert estimated future care expenses of $2,867,499. The trial judge decided that $3,500,000 struck a good balance between the two estimates. Under the standard for appellate review of the trial court's evaluation of expert testimony set forth in Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990), we do not find that the trial judge manifestly erred in deciding on an award somewhere between the two estimates. The trial court's judgment holding the State, DOTD liable to Cory for $2,800,000 ($3,500,000 × 80%) for future care expenses, and Jack Ortego, Sr. liable for $175,000 ($3,500,000 × 5%) is affirmed.
Finally, plaintiffs contend the trial judge clearly erred in awarding only $10,500 for Cory's future medical expenses. The trial judge stated in his oral reasons for judgment that he was relying on the testimony of Dr. Romero, Cory's plastic surgeon, as to the amount necessary for the future skin grafts. We find that the trial judge did clearly err in making the award, since Dr. Romero testified that Cory would require at least one more surgery to reduce the contraction of his neck caused by his scars, which is reducing the range of motion of his neck and arm and is drawing the right side of his face, restricting his facial expressions. Dr. Romero also testified that Cory would require three to five surgeries, at a cost of $8,000 to $10,000 each (based on 1991 rates), to rebuild his right ear. We note that Dr. Romero's testimony was not contradicted. Therefore, the award to Cory Deville for future medical expenses is raised to $60,500. The State, DOTD is cast in judgment to Cory for $48,400 ($60,500 × 80%) for future medical expenses. Jack Ortego, Sr. is cast in judgment for $3,025.

DEVILLES' LOSS OF CONSORTIUM DAMAGES
Next, plaintiffs argue that the trial judge's awards for loss of consortium were inadequate. The trial judge awarded $10,000 for loss of consortium to J.W. Deville and $35,000 for loss of consortium to Barbara Deville. The reason for the different awards is, apparently, because Cory's parents separated and divorced about a year after the accident and Barbara received custody of Cory. Barbara did not work and took care of Cory for about a year after he returned home from the rehabilitation center. Both parents testified as to the extra care each gave Cory after he returned home from his initial hospital stay and prior to their separation, and as to the changes in their relationships with Cory. Each parent also testified that, although the separation would probably have occurred anyway, the accident did intensify their existing marital problems.
Loss of consortium in the parent-child context means "loss of the aid, assistance and companionship of the child." Other elements of loss of consortium are loss of affection, society and service. See Lee v. USAA Cas. Ins. Co., 540 So.2d 1083 (La.App. 1st Cir.1989).
*579 After reviewing the evidence and the jurisprudence, we do not find that the trial judge clearly abused his discretion in awarding $35,000 to Barbara Deville. See Lee, supra. However, we find that trial judge did abuse his discretion in awarding only $10,000 to J.W. Deville. The evidence showed that Barbara Deville spent more time with Cory than did J.W. and was granted custody. However, Barbara did not work outside her home, while J.W. had two jobs. There was no evidence that J.W. and Cory did not love each other or that J.W. neglected or ignored Cory. Under the circumstances, the amount of time J.W. and Cory actually spent together is simply not an accurate indication that J.W. has suffered less of a loss than Barbara has. Therefore, we raise the award for loss of consortium to J.W. Deville to the lowest reasonable amount, $20,000. See Reck v. Stevens, 373 So.2d 498 (La.1979); Lee, supra.
Therefore, the trial court's judgment holding the State, DOTD liable to Barbara Deville for $28,000 ($35,000 × 80%) and Jack Ortego, Sr. liable for $1,750 ($35,000 × 5%) is affirmed. The State, DOTD is cast in judgment to J.W. Deville for $16,000 ($20,000 × 80%) and Jack Ortego, Sr. is cast in judgment for $1000 ($20,000 × 5%).

CONSTITUTIONALITY ISSUE
Finally, plaintiffs raise on appeal, for the first time, the issue of the constitutionality of the statutory limits on general damages and prejudgment interest, under LSA-R.S. 13:5106 and LSA-R.S. 13:5112, for which the State can be held liable. Although this is a very interesting issue, in light of the recent supreme court case of Butler v. Flint Goodrich Hospital, 607 So.2d 517 (La.1992), in which the court examined the constitutionality of the statutory limit on medical malpractice awards, LSA-R.S. 40:1299.42(B)(1), we cannot consider it since the issue was not first raised in the trial court. Generally, a plea of unconstitutionality of a statute cannot be raised in the court of appeal where it was not pleaded in the trial court. See Lemire v. NOPSI, 458 So.2d 1308 (La.1984); Long v. Northeast Soil Conserv. Dist. of La., 226 La. 824, 77 So.2d 408 (1954). There are no exceptional circumstances present in this case which merit a waiver of that rule. Compare City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397 (La.1987); Summerell v. Phillips, 258 La. 587, 247 So.2d 542 (1971); Long v. Northeast Soil Conserv. Dist. of La., supra.

DISPOSITION
For the reasons given, the judgment of the trial court is modified as follows:
"The award of general damages to Cory Deville is raised to $750,000, for which the State, DOTD is cast in judgment for $500,000 and Jack Ortego, Sr. is cast in judgment for $37,500.
"The award of future medical expenses to Cory Deville is raised to $60,000, for which the State, DOTD is cast in judgment for $48,400 and Jack Ortego, Sr. is cast in judgment for $3,025.
"The award of loss of consortium damages to J.W. Deville is raised to $20,000, for which the State, DOTD is cast in judgment for $16,000 and Jack Ortego, Sr. is cast in judgment for $1000."
The judgment of the trial court is affirmed in all other respects. Costs of this appeal are assessed to the State, DOTD.
AFFIRMED IN PART; AMENDED IN PART; RENDERED.
NOTES
[1] These suits were filed against the State, DOTD, its subcontractors and their insurers, and Jack Ortego, Sr.'s insurer, New Hampshire Insurance Co. The Devilles' suit also includes Jack Ortego, Sr. as a defendant.
[2] Although the judgments rendered in these consolidated cases do not so provide, the liability of the parties found to have been at fault would be solidary. Roberts v. State, through DOTD, supra; Robinson v. State, through DOTD, 454 So.2d 257 (La.App. 1st Cir.), writ denied, 458 So.2d 122 (La.1984).
[3] See the discussion of the limited scope of Civil Code Article 2315.6 in the Comment by Cullen J. Dupuy, "Negligent Infliction of Emotional Distress: The Effect of Article 2315.6", 53 La.L.Rev. 556, 566-579 (1992).